UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| JOHN DOE 156, | Case No. 10-cv-4728 JNE/SER |
| Plaintiff, | |
| v. | **SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFF'S DAMAGES** |
| GREGG ALAN LARSEN, and Downloader 1 - Downloader 100, | |
| Defendants. | |

## INTRODUCTION

The Plaintiff was placed in Defendant Larsen's home as a foster child when he was 10 years old. Instead of nurturing and caring for the minor Plaintiff, Defendant Larsen sexually abused the Plaintiff and produced child pornography involving the minor Plaintiff. Plaintiff's young life has been virtually ruined as a result of the abuse and pornography. This Memorandum is submitted in support of Plaintiff's damages in his civil lawsuit for sexual abuse and production, distribution and possession of child pornography.

## FACTS

Plaintiff John Doe 156 had a very difficult childhood. Plaintiff's birth father was a heavy drinker and was physically abusive to Plaintiff's mother. (John Doe 156 Affidavit, ¶ 2.) When Plaintiff was 3 years of age, his mother divorced his birth father. (*Id.*) Shortly after her divorce from Plaintiff's birth father, Plaintiff's mother married another man who was also a heavy drinker and also physically abusive. (*Id.*) Plaintiff

1

remembers watching his step-father beat his mother. (*Id.*) At one point, Plaintiff's mother obtained a shotgun and shot at Plaintiff's step-father during an especially brutal beating. (*Id.*) As a result, when Plaintiff was 7 years old, the Plaintiff and his brother and sister, were removed from the family home and placed into foster care. (*Id.*) Shortly after, Plaintiff's mother's parental rights were terminated, leaving the Plaintiff, for the most part, an orphan within the Minnesota foster care system. (*Id.*)

When Plaintiff was 10 years old, he was placed in the foster home of Defendant Gregg Larsen. (John Doe 156, Aff. ¶ 3.) Having been in a number of foster homes, the 10 year old Plaintiff was very suspicious of Defendant Larsen at first. (*Id.*) Over time, Defendant Larsen appeared to be interested in caring for the Plaintiff and the Plaintiff began to trust Larsen. (*Id.*) When Plaintiff was 11 years old, Defendant Larsen adopted the Plaintiff. (*Id.*) This was good news for the Plaintiff because it appeared to the Plaintiff that he had finally found a stable and permanent home where he could be safe. (*Id.*) Unfortunately, the Plaintiff was wrong.

Instead of loving and caring for the Plaintiff, Defendant Larsen betrayed and hurt the Plaintiff. When Plaintiff was 12 or 13 years old, Defendant Larsen began touching the Plaintiff's penis inappropriately. (John Doe 156 Affidavit, ¶ 4.) At the time, Plaintiff did not understand the sexual contact or that it was wrong. (*Id.*) Plaintiff trusted the Defendant Larsen so much that the Plaintiff did not believe that Defendant Larsen would ever hurt him. (*Id.*)

Shortly after the sexual abuse began, the Plaintiff began acting out. When Plaintiff was 13 years old, he began stealing money and other items from the Defendant

Larsen. (John Doe 156 Affidavit, ¶ 7.) In addition, Plaintiff began regularly arguing with Defendant Larsen, skipping school and running away from home. (*Id.*)

When Plaintiff lived with Defendant Larsen, the home was somewhat crowded and simple. Plaintiff did have his own bedroom, but there was not much privacy. (John Doe 156 Affidavit, ¶ 5.) In addition to the Plaintiff, there were other foster children living in the home. (*Id.*) There was only 1 bathroom in the home. (*Id.*)

During Plaintiff's freshman year in high school, the Plaintiff made an unusual discovery. One day, when Plaintiff was home alone, Plaintiff decided to watch a movie on the VCR. (John Doe 156 Affidavit, ¶ 6.) When the Plaintiff turned on the VCR, Plaintiff observed on the television screen, the image of the bathroom. (*Id.*) After additional investigation, the Plaintiff realized that Defendant Larsen had placed a secret camera in the bathroom. (*Id.*) When Defendant Larsen returned home that evening, the Plaintiff confronted Larsen about the camera. (*Id.*) According to Defendant Larsen, he had placed the camera in the bathroom in order to insure that the Plaintiff was safe and not engaging in any at-risk behaviors. (*Id.*) Plaintiff believed Defendant Larsen, thinking that he was just being overprotective. (*Id.*)

Approximately a year later, when Plaintiff was 16 years old, the Plaintiff, again, ran away from home. (John Doe 156 Affidavit, ¶ 8.) After about 1 ½ weeks, a counselor from the youth homeless shelter in Nebraska where Plaintiff was staying, contacted Defendant Larsen to arrange for Plaintiff to return home. (*Id.*) At the time, Plaintiff had no clothes, food, or money. (*Id.*) When Defendant Larsen sent Plaintiff a bus ticket to return home, Plaintiff refused to return to Minneapolis and instead, went to Milwaukee,

Wisconsin. (*Id.*) While in Milwaukee, the Plaintiff stayed in a youth homeless shelter in Milwaukee for approximately 1 ½ months before returning Minneapolis. (*Id.*) In order to ensure a safe return to Minneapolis, a social worker went to Milwaukee to escort the Plaintiff home. (*Id.*) When the social worker asked Plaintiff why he continued to run away from Gregg's home, Plaintiff told the social worker about the secret camera in the bathroom at Gregg's house. (*Id.*)

When Plaintiff returned to Minnesota, he was not welcome at Defendant Larsen's home. (John Doe 156 Affidavit, ¶ 9.) After about 2 months, Plaintiff ran away for good. (*Id.*) For the next 5 years, the Plaintiff was virtually homeless. (*Id.*) Plaintiff lived with friends and relatives and also lived in parks and other outside places. (*Id.*) At one point Plaintiff began sleeping in the Hennepin County Medical Center bathrooms in order to avoid the cold. (*Id.*) Other times, Plaintiff stayed at homeless shelters. (*Id.*) When Plaintiff was 20 years old, he found a permanent home at the Continental Hotel at Twelfth and Nicollet in Minneapolis. (*Id.*) Plaintiff stayed at the Continental Hotel for about 3 months. (*Id.*)

While living at the Continental, Plaintiff was visited by two FBI agents. (John Doe 156 Affidavit, ¶ 10.) During that visit, Plaintiff learned that Defendant Larsen had been recording video images of Plaintiff in the bathroom at his house when Plaintiff was a minor. (*Id.*) The agents also told Plaintiff that Defendant Larsen had posted naked video images of the minor Plaintiff to a website online. (*Id.*) Even though Plaintiff has not seen all of the video images that Defendant recorded, Plaintiff is sure that Defendant recorded images of Plaintiff masturbating while he was in the bathroom. (*Id.*)

Unfortunately, in 2009, Plaintiff was arrested for stealing a car. (John Doe 156 Affidavit, ¶ 11.) In fact, Plaintiff had stolen the car and admitted to doing so to the police officer that questioned him. (*Id.*) Plaintiff pled guilty to auto theft and was sentenced to 11 months in the Minnesota Department of Corrections. (*Id.*) Plaintiff spent 8 months in prison where he earned his G.E.D and a certificate in money management. (*Id.*)

Plaintiff believes that he has been severely affected by the abuse and child pornography. Plaintiff is very paranoid about cameras. (John Doe 156 Affidavit, ¶ 12.) Plaintiff avoids using public restrooms and places with cameras. (*Id.*) If Plaintiff needs to use the bathroom while he is in public, Plaintiff will wait until he gets home. (*Id.*) In fact, Plaintiff recently quit a job with Burger King because they installed cameras in the area where Plaintiff worked. (*Id.*) Plaintiff describes feeling that he has "a lot of feelings about what Gregg did to me that I have trouble finding words to describe." (*Id.*) Plaintiff also feels tremendous guilt about the fact that some of his friends were also recorded while they were in the bathroom at Defendant Larsen's house. (John Doe 156 Affidavit, ¶ 13.) When Plaintiff sees these friends, he is humiliated and embarrassed. (*Id.*)

Even though he had a rough beginning in life, Plaintiff believed that he could still have been a good person, have a good job and have a family. (John Doe 156 Affidavit, ¶ 14.) Plaintiff continues to have trouble trusting anyone which has kept Plaintiff from being able to get a good job and meeting a good girl and having a family. (*Id.*) Plaintiff wants to get out of this cycle where he continues making the same mistakes and can't trust anyone, but he is not sure how. (*Id.*) Plaintiff desires to go back to school and

become a psychologist and work within the foster care system in Minnesota to help those kids who were vulnerable like he and his brother and sister. (*Id.*)

In order to better understand the significant impact of the sexual abuse and child pornography on the Plaintiff, Plaintiff's counsel retained psychologist Susan Phipps-Yonas, Ph.D., LP. After performing a thorough evaluation of the Plaintiff, Dr. Phipps-Yonas opined that Plaintiff was severely damaged by Defendant Larsen's conduct. (Psychological Evaluation of Susan Phipps-Yonas, Ph.D. attached to Affidavit of Patrick Noaker as Ex. 5.). Further, Dr. Phipps-Yonas also noted that being an abandoned foster child, the Plaintiff was especially vulnerable when he was young. (*Id.*) This vulnerability caused the Plaintiff to be more profoundly impacted by Defendant Larsen's criminal acts than another child who was not as vulnerable. (*Id.*) According to Dr. Phipps-Yonas:

> The picture that has emerged over the course of this evaluation is that of [a] young man who was failed first by his birth parents and then, even more dramatically, by his adoptive father, as well as by a social service system that for unknown reasons did not investigate his report that he did not want to live at his home because of the presence of a hidden camera in the bathroom there. The available data indicate that [Plaintiff] is a lonely and troubled individual whose childhood has given him good cause to see the world through a negatively toned lens and to have difficulty trusting other people. . . [Plaintiff] was clearly a highly vulnerable boy when he began living with Gregg Larsen, and what happened in that home greatly exacerbated his vulnerability to develop the psychiatric symptoms (including elements of Posttraumatic Stress Disorder) and maladaptive personality traits that he has since demonstrated. It appears that there was no one "there for him" as he struggled through adolescence, and sadly that may still be the case.
>
> Like many victims of childhood sexual abuse, [Plaintiff] is at an elevated risk to suffer ongoing psychological, interpersonal, and medical problems throughout his life.

(*Id.*)

Not surprisingly, Plaintiff has struggled in the past and continues to struggle to maintain consistent employment. In 2007, Plaintiff worked for Holiday convenience store for 3 months making $7.00 per hour with no benefits and working approximately 12 hours per week. (John Doe 156 Affidavit, ¶ 15.) After that, also in 2007, Plaintiff worked three months for the Baja Sol restaurant in downtown Minneapolis where he made $7.00 per hour with no benefits and worked 30 – 32 hours per week. (*Id.*) In 2008 and 2009, for 10 months, Plaintiff worked for Burger King on the University of Minnesota campus where he made $7.25 per hour and worked 20 – 25 hours per week. (*Id.*) In 2010, Plaintiff worked for the same Burger King restaurant for 3 months where he continued to be paid $7.25 per hour, working 25 hours per week. (*Id.*) Now, Plaintiff works for Old Country Buffet in Richfield where he is paid $8.00 per hour. (*Id.*) Plaintiff hopes to work 16 hours per week at the beginning and ultimately work for 40 hours per week once he proves himself. (*Id.*)

In an effort to try and get help, the Plaintiff made a claim for restitution in the criminal proceedings. Unfortunately, the restitution statute only provides for reimbursement of medical and psychological treatment and rehabilitation. 18 U.S.C. § 2259(b)(3)(A) and (B); *U.S. v. Laney*, 189 F.3d 954, 966 (9th Cir. 1999). As Plaintiff has no health insurance or money, he has not been in the position to seek the treatment that he needs, even if that treatment could ultimately be reimbursed through the restitution process.

Consequently, this civil lawsuit was filed on Plaintiff's behalf. On November 24, 2010, Plaintiff filed a Complaint in the United States District Court for the District of

Minnesota seeking damages for injuries relating to Defendant Gregg Larsen possessing, manufacturing and distributing child pornography depicting the Plaintiff. On December 13, 2010, a Summons and Complaint was personally served on Defendant Gregg Alan Larsen. (Aff. of Service.)

On January 3, 2011, Defendant Gregg Alan Larsen's Answer to the Complaint was due. (Noaker Aff. ¶ 9.) On February 8, 2011, the Court advised Plaintiff to notify Defendant Gregg Alan Larsen that he was required to file a responsive pleading; or, in the alternative, file an application for entry of default. (*Id.* at ¶ 10.) On February 9, 2011, Plaintiff filed with the Court and served on Defendant Gregg Alan Larsen the following: (1) Application for Entry of Default; and (2) Affidavit in Support of Application for Entry of Default. (*Id.* at ¶ 11.)

On May 4, 2011, Plaintiff filed with the Court and served on Defendant Gregg Alan Larsen the following: (1) Application for Default Judgment and Motion for an Evidentiary Hearing to Determine Damages; (2) Notice of Motion; (3) Memorandum in Support of Plaintiff's Application for Default Judgment and Motion for an Evidentiary Hearing to Determine Damages; and (4) Affidavit of Patrick W. Noaker. (*Id.* at ¶ 12.) On May 5, 2011, Plaintiff filed with the Court and served on Defendant Gregg Alan Larsen an Amended Memorandum in Support of Plaintiff's Application for Default Judgment and Motion for an Evidentiary Hearing to Determine Damages. (*Id.* at ¶ 13.) On May 9, 2011, Plaintiff filed with the Court and served on Defendant Gregg Alan Larsen the following: Application for Default; and (2) Affidavit of Patrick Noaker. On May 11,

2011, the Court entered Default Judgment against Defendant Gregg Alan Larsen. (*Id.* at ¶ 14.)

On June 16, 2011, the hearing on Plaintiff's Motion for Default Judgment and Evidentiary Hearing to Determine Damages was held. In an Order dated June 16, 2011, the Court ruled that Plaintiff's Motion for Default would remain pending until an evidentiary hearing could be held on the issue of damages. (Order dated June 16, 2011.) In that same order, Plaintiff's counsel was directed to schedule an evidentiary hearing on the issue of damages and submit a detailed Findings of Fact and Conclusions of Law to the Court and also file this Supplemental Memorandum. (*Id.*)

## DAMAGES

In his Complaint, Plaintiff brings civil claims against Defendant Larsen for production and distribution of child pornography in violations of 18 U.S.C.A. §§ 2251 and 2252A and also a state law claim for sexual battery. (Complaint.) In this case, Plaintiff has been injured by both of the criminal acts committed by Defendant Larsen; however, the related nature of the criminal conduct caused Plaintiff to suffer the same injuries from the combination of both of the acts. Where possible, Plaintiff will distinguish which criminal act, child pornography or sexual abuse, caused the injury described. Otherwise, Plaintiff will describe the injury as being caused by the combination of both of the criminal acts (collectively the "abuse").

a.  **Plaintiff's Damages Caused by Defendant Larsen's Child Pornography and Sexual Abuse of Plaintiff**

Child sexual abuse and child pornography have devastating consequences on the lives of victims. Victims often demonstrate a variety of emotional, behavioral, and social difficulties as a consequence of the abuse. (Susan Phipps-Yonas September 23, 2010 Aff., ¶ 3 attached to Affidavit of Patrick Noaker as Exhibit 1), September 23, 2010). Victims are also at elevated risk to display cognitive deficits. *Id.* Study after study demonstrates that a victim of child sexual abuse has a heightened risk of psychiatric problems both in the short-term and through the rest of their life. *Id.*; Holmes and Slap, Sexual Abuse of Boys, *Journal of the American Medical Association*, December 2, 1998, Vol. 280, No. 1, 1855-1862 attached as Exhibit 2 to Noaker Affidavit; Nelson et al., Association Between Self-Reported Childhood Sexual Abuse and Adverse Psychosocial Outcomes, *Archives of General Psychiatry*, February 2002, Vol. 59, 139 – 145 attached as Exhibit 3 to Noaker Affidavit; Kendall-Tackett, Williams and Finkelhor, Impact of Sexual Abuse on Children: A Review and Synthesis of Recent Empirical Studies, *Psychological Bulletin*, 1993, Vol. 113, No. 1, 164 – 180 attached as Exhibit 4 to Noaker Affidavit. Abuse victims face, the "the risk of 'depression and other psychosocial disorders, promiscuity and revictimization' as well as 'guilt, shame, phobias, and eating disorders.'" *Bjerke v. Johnson*, 742 N.W.2d 660, 670 (Minn. 2007) (*citing* Michelle Oberman, *Regulating Consensual Sex with Minors: Defining a Role for Statutory Rape*, 48 Buff. L. Rev. 703, 728-79 (2000)).

A victim of a tort is entitled to recover damages from the tortfeasor for all harm, past, present, and prospective, legally caused by the tort." *Restatement (Second) of Torts* §§ 903 and 910 (1979); *Ray v. Miller Meester Advertising, Inc.*, 684 N.W.2d 404, 407 (Minn. 2004). These damages include past and future pain, lost wages, the loss of future earning capacity, emotional distress, mental suffering, and humiliation. *See Graff v. Swendra Agency, Inc.*, 800 N.W.2d 112, 121 (Minn. 2011); *Johnson v. Ramsey County*, 424 N.W.2d 800, 804 (Minn. Ct. App. 1988) ("Once a battery has been proved, compensatory damages may be awarded for humiliation and mental suffering.")).

In this case, the fact that the Plaintiff was an abandoned foster child when he met Defendant Larsen exacerbates Plaintiff's injuries from the abuse. According to Dr. Phipps-Yonas:

> [Plaintiff] was clearly a highly vulnerable boy when he began living with Gregg Larsen, and what happened in that home greatly exacerbated his vulnerability to develop the psychiatric symptoms (including elements of Posttraumatic Stress Disorder) and maladaptive personality traits that he has since demonstrated. It appears that there was no one "there for him" as he struggled through adolescence, and sadly that may still be the case.
>
> Like many victims of childhood sexual abuse, [Plaintiff] is at an elevated risk to suffer ongoing psychological, interpersonal, and medical problems throughout his life.

(Psychological Evaluation of Susan Phipps-Yonas, Ph.D. attached to Affidavit of Patrick Noaker as Ex. 5.).

Here, Plaintiff has suffered numerous effects from the abuse and will continue to struggle with its repercussions in the future. Using Dr. Phipps-Yonas' term, Plaintiff's maladaptive personality traits caused by the sexual abuse and child pornography have

virtually ruined the Plaintiff's young life. As discussed, Plaintiff's inability to trust anyone caused the Plaintiff to become homeless and ultimately engage in criminal activity in order to eat. That same inability to trust continues to be a major barrier to Plaintiff obtaining and sustaining employment and pursuing a family. This downward trajectory was, unfortunately, set by Defendant Larsen, when Larsen used the vulnerable child Plaintiff for sexual pleasure instead of nurturing and caring for the Plaintiff.

By all accounts, Plaintiff has been profoundly and permanently injured as a result of Defendant Larsen's sexual abuse. Even though Plaintiff had a tough childhood before meeting Defendant Larsen, it was the sexual abuse that placed Plaintiff on a path of self-destruction. The sexual abuse by Defendant Larsen sent Plaintiff into the streets and into a life of petty crime. As a result, Plaintiff endured a prison sentence and will have to live with the stigma and repercussions of his conviction for the rest of his life. Plaintiff's background will significantly affect his future job prospects and earning capacity. Defendant Larsen's exploitation and abuse of Plaintiff is the root cause of these most significant troubles in Plaintiff's life.

Because of the life-long effects of child sexual abuse, courts have made significant damage awards to Plaintiffs. In *Mrozka v. Archdiocese of St. Paul and Minneapolis*, 482 N.W.2d 806, 809 (Minn. Ct. App. 1992), the trial court awarded $855,000 in compensatory damages to the plaintiff for his negligence claim against the Archdiocese arising out of their failure to protect the plaintiff against sexual abuse by their employee. In *Michl Uhde v. Diocese of Davenport Iowa*, the jury awarded $1,536,800.00 in compensatory damages. (Attached as Ex. 6 to Noaker Affidavit.) Likewise, in *James v.*

*Janssen*, the jury awarded $1.26 million in compensatory damages. (Attached as Ex. 7 to Noaker Affidavit.).

None of these cases involved sexual abuse by a custodial parent or foster parent like the current matter. As discussed above, Defendant Larsen's betrayal and manipulation of the dependent foster child Plaintiff has permanently ruined the Plaintiff's life. Plaintiff will never recover from the abuse that he experienced throughout his childhood in Defendant Larsen's foster home. The Plaintiff is destined to have psychological problems for the rest of his life. Accordingly, Plaintiff requests an award of $200,000 for future medical and psychological treatment. In addition, the Plaintiff requests that this Court award $600,000 for past emotional distress and pain and suffering and $800,000 for future emotional distress and pain and suffering relating to the sexual abuse.

Plaintiff will also be only eligible to find employment with low wages due to Plaintiff's psychological problems and due to Plaintiff's criminal record. Plaintiff requests that this Court make an award for past wage loss and for future wage loss and loss of earning capacity consistent with the diminution in Plaintiffs earning capacity caused by Defendant Larsen's sexual abuse. A more detailed wage loss and loss of earning capacity analysis will be submitted to the Court under separate cover and at a later date.

      **b.**    **Injury Uniquely Related to Defendant Larsen's Production and Distribution of Child Pornography of Plaintiff**

The production and distribution of child pornography works a rather unique harm

on the victim. When children are the subjects of pornographic materials, it "is harmful to the physiological, emotional, and mental health of a child." *New York v. Ferber*, 458 U.S. 747, 758 (1982). Some experts believe that "[p]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution." *Id.* at 760, fn. 10. Due to the fact that, "[a] child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography." *Id.* at 760, fn. 10. Consequently, "the distribution and circulation of the pornographic images forever exacerbates the harm to these child victims." *Id.* at 759.

Here, Plaintiff is susceptible to ongoing mental, physiological, and mental health problems arising directly from Defendant Larsen's production and distribution of sexually explicit photos of Plaintiff. Dr. Phipps-Yonas highlights, "the fact that he has no way to know when a pornographic image of him might surface at any point in the future makes closure regarding his exploitation difficult, if not impossible." (Pl.'s Ex. 1, 11). Consequently, Dr. Phipps-Yonas contends that this will create an ongoing impediment to his ability to cope, especially if he faces new adversities. *Id.* It is the opinion of Dr. Phipps-Yonas that it would be very beneficial for the Plaintiff to enter therapy with a professional experienced in treating males with similar histories. *Id.*

Dr. Phipps-Yonas' opinion is consistent with the Plaintiff's experience of the child pornography. Plaintiff believes that he has been severely affected by the abuse and child pornography. Plaintiff is very paranoid about cameras. (John Doe 156 Affidavit, ¶ 12.) Plaintiff avoids using public restrooms and places with cameras. (*Id.*) If Plaintiff needs to use the bathroom while he is in public, Plaintiff will wait until he gets home.

14

(*Id.*) In fact, Plaintiff recently quit a job with Burger King because they installed cameras in the area where Plaintiff worked. (*Id.*)

Plaintiff has brought his federal claims pursuant to the civil remedy provision, 18 U.S.C.A. § 2255, which provides that a person who suffers a personal injury as a result of a violation of §§ 2251 and 2252A, among others, "shall recover actual damages such person sustains and the cost of the suit, including a reasonable attorney's fee." The civil remedy provides that victims under the statute "shall be deemed to have sustained damages of no less than $150,000 in value." 18 U.S.C.A. § 2255(a).

Actual damages are a synonym for compensatory damages. *Phelps v. Commonwealth Land Title Insurance Co.*, 537 N.W.2d 271 , 275 Minn. 1995) (*citing Black's Law Dictionary* 390 (6th Ed. 1990)). Compensatory damages are "awarded to a person as compensation, indemnity, or restitution for harm sustained by him." *Restatement (Second) of Torts §* 903 (1979). By analogy, "compensable losses under 18 U.S.C. § 2259, the restitution statute, "include the cost of the victim's 'medical services relating to physical, psychiatric, or psychological care.' 18 U.S.C. § 2259(b)(3)(A), and 'physical and occupational therapy or rehabilitation.' *Id.* § 2259(b)(3)(B)" *U.S. v. Laney*, 189 F.3d 954, 966 (9th Cir. 1999). Moreover, "Payments made for past and future pain, lost wages, the loss of future earning capacity, disability, and emotional distress" are all types of damages "which flow directly from a given injury or disability." *Graff*, 800 N.W.2d at 121. Consequently, Plaintiff is entitled to medical expenses, lost wages, past or future pain, and emotional distress, stemming from Defendant's production and distribution of child pornography.

According to Dr. Susan Phipps-Yonas, the sexual exploitation through child pornography has caused, and will continue cause, devastating psychological effects and emotional distress for the Plaintiff. Plaintiff will, no doubt, struggle daily to cope with the harm done to him and the repeated harm inflicted by the knowledge that compromising photos of him are exposed on the internet. These issues will undeniably travel with Plaintiff as he seeks an education, employment, and a family life.

Although the minimum amount of damages to Plaintiff is $150,000, significant losses to Plaintiff can be attributed to the widespread dissemination of these his images and the possession of these images by many individuals. *See U.S. v. Paroline*, 672 F.Supp.2d 781, 792 (E.D. Tex. 2009). In the instant case, Plaintiff's damages stem directly from Defendant Larsen's production and distribution of pornography. His present and future harm are the direct result of the actions of Defendant Larsen. Plaintiff requests an award of $ 3 million in compensatory damages arising from the production and distribution of pornography by Defendant Larsen.

    **c.**    **Attorney's Fees**

The civil remedy statute also allows for the award of a reasonable attorney's fee. 18 U.S.C.A. § 2255. Counsel for the Plaintiff will submit a detailed description of his hours, costs and disbursements relating to the prosecution of this matter.

## CONCLUSION

Without question Plaintiff has suffered significant mental and emotional injuries due to Plaintiff's actions in sexual abusing him and producing and distributing pornographic images of the Plaintiff. Plaintiff will always live with the emotional scars

16

of his abuse. Moreover, his recovery from Defendant's exploitation will forever be hindered by his constant awareness that photographs of him are available on the internet. Accordingly, Plaintiff requests that this Court award significant damages for his mental and emotional injuries.

Dated: October 7, 2011.                    JEFF ANDERSON & ASSOCIATES, P.A.


                                           s/Patrick W. Noaker
                                           By: Jeffrey R. Anderson, #2057
                                           Patrick W. Noaker, # 274951
                                           Attorneys for Plaintiff
                                           366 Jackson Street, Suite 100
                                           St. Paul, Minnesota 55101
                                           (651) 227-9990